**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| COBY CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 2:11-CV-2236-DCN |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANTS' MEMORANDUM** |
| THE CITADEL, BOARD OF VISITORS, | ) | **IN OPPOSITION TO MOTION FOR** |
| GENERAL JOHN W. ROSA, | ) | **PRELIMINARY INJUNCTION** |
| COLONEL LEO MERCADO, AND | ) | |
| LIEUTENANT A. COLONEL | ) | |
| CHRISTOPHER L. MOORE, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

The Plaintiff's motion for preliminary injunction should be denied because he has very little likelihood of succeeding on the merits of his claim. The Plaintiff was dismissed (dismissal is a lesser sanction than expulsion and greater than suspension) from The Citadel for violating The Citadel's published drug policy. He admitted to smoking K2/Spice, synthetic marijuana, both off campus and on campus, knowing that he was violating The Citadel's drug policy. He was given due process far exceeding minimum constitutional requirements for college discipline, was found guilty of the offense, and was given a sanction expressly provided for in the College Regulations. The Plaintiff has shown no basis on which this Court should alter the status quo, summarily nullify The Citadel's College Regulations, and award him preliminary relief that he would not be entitled to even after a full trial on the merits.

**STATEMENT OF FACTS**

Cadet Carter entered The Citadel as a member of the Class of 2014 on August 14, 2010.  He was assigned to Kilo Company.  Between August and December, 2010, Cadet Captain Stephen Townes instructed Carter and other freshmen in his company that they could be dismissed if caught using or possessing a synthetic substance known alternatively as K2, Spice or K2/Spice.  Commandant's Board Report, Section IV, ¶ 5/**Exhibit A**. bates 114-15.

On December 12, 2010, Cadet Clay Frontz conducted an "all-in" inspection of Kilo Company freshmen.  *Id.,* ¶ 2, bates 111-12.  During this process, Cadet Frontz inspected the drawers of the "half presses," (*i.e.* the chest of drawers), in Cadet Carter's room, and discovered a bowl used for smoking drugs in the drawers of Cadet Nelson, Cadet Carter's roommate. *Id.*  Almost immediately, Cadet Mee Dum Baek, Cadet Carter's classmate, admitted that he, Carter, and Cadet Nelson Alexander had used the bowl to smoke K2, both on and off campus*. Id.*  Cadet Frontz alerted the cadet leadership of Kilo Company, who questioned Baek, Carter, and Nelson, all of whom allegedly admitted that they knew the use and possession of K2/Spice violated The Citadel's rules and regulations.  *Id.*  The cadet leadership then directed Baek, Carter and Nelson to write statements concerning their use of K2/Spice.  In an unsigned statement, Carter admitted to smoking K2 both in and outside of the barracks; he also admitted that he knew K2 "was an illegal substance at The Citadel." *Id*., bates  151.[1]

The Citadel's *College Regulations* "prohibit() all students, at any time or place,

---

[1] Carter later denied knowing that the use or possession K2/Spice was prohibited by The Citadel.  *See* Exhibit A, bates 135.

whether on- or off-campus, from possessing, using, manufacturing or distributing (a) any hallucinogenic . . . drug or substance . . . as defined in South Carolina Code Ann. § 44-53-110… (and) (b) any other hallucinogen which causes a loss of control or inebriation, *including but not limited to salvia / Salvia Divinorum, Spice, K2, or any variation or derivative thereof, regardless of form*." *See College Regulations*, Section IV, ¶ 19.a.(1)/**Exhibit B**, bates. 18-26 (as amended June 12, 2010) (emphasis added). Knowingly "using or possessing [these particular drugs]" by a Citadel student "at any time or place, whether on- or off- campus . . . is subject to dismissal from the College." *Id*. The *College Regulations* are published on The Citadel's website.

In the fall of 2010 (prior to this incident), the Commandant's Department undertook an education campaign to inform cadets of the dangers of K2/Spice and other types of synthetic marijuana, through the Leadership Education Program, class-wide addresses, and the tactical officers. *See* Affidavit of Leo Mercado, ¶ 11/**Exhibit C**; Affidavit of Christopher L. Moore, ¶ 12/**Exhibit D**. The Commandant's Department advised freshman and sophomore cadets of the penalties for the use or possession of synthetic hallucinogens during the first few weeks of the Fall semester, through the Leadership Education Program, the weekly meetings between freshmen and company tactical officers. *Id*. Lesson plans for Alcohol and Drug Module 4-1, which was taught by company tactical officers, included a discussion of "designer" drugs, and also "hallucinogens," and emphasized that The Citadel's "Drug Policy" was "zero tolerance." These plans repeatedly stressed that the penalty for drug use is expulsion. *Id.*

As a result of the discovery of paraphernalia commonly associated with the use

of drugs, and Cadet Carter's admission to smoking K2/Spice, Lt. Col Robert Sberna, Assistant Commandant of Cadets, issued Performance Reports ("PRs") to Cadets Carter, Baek and Nelson[2] accusing them of "Possession/Use of a Prohibited Drug – K2 / Spice: synthetic THC. Performance Report, 12/13/2010" and which indicated that the maximum punishment was "dismissal." Exhibit A, bates 134. In his "Explanation of Report, Written," Carter indicated that the Performance Report was "Correct," and admitted that his "classmate (Baek) got caught with a bowl in my room that we all smoked out of." *Id.*, bates 135.

On January 11, 2011, Colonel Moore appointed Commandant's Board #17 to hear the allegations against Cadet Carter.[3] *Id.*, bates 125. In separate documents, Moore identified Cadets Nelson Carter, Baek, Nelson, and Frontz as witnesses, as well as Lt. Colonel Sberna. *Id.*, bates 128-29. Major Glenn Remsen emailed documents identifying these witnesses to Carter on January 13, 2011. *Id.*, bates 147; *see also*, Affidavit of Glenn Remsen, ¶ 6/**Exhibit E**. Moore subsequently identified Cadets Lucas Wren and Stephen Townes, and Lt. Colonel Larry Lee and Captain Justin Pesterfield to testify at the hearing reconvened on February 16, 2011. Exhibit A., bates 149-50.

The Commandant's Board held its initial hearing on January 25, 2011. Cadet Carter attended and was advised by Cadet Raymond Anderson, a senior cadet. *Id.*, bates 107. Lt. Colonel Sberna testified at length, describing the education program provided to freshmen during the Fall of 2010 concerning the dangers, including the

---

[2] Baek and Nelson subsequently resigned from The Citadel.
[3] Commandant's Board #17 was formally adopted on January 11, 2011, with the appointment of Lieutenant Colonel ("LTC") Tom Harris as President of the Board, and Major Glen Remsen, LTC Bill Bell and Cadet major Joshua Clarey serving as Members. Exhibit A, bates 125

punishments associated with the use or possession of K2/Spice and other synthetic marijuana substances. *Id.,* bates 110-11. Cadet Frontz also testified, and described his discovery of the drug paraphernalia in Cadet Carter's room. *Id.*, bates 111-12. After a short recess, the Board was postponed when it was discovered that the specimen and pipe discovered in Cadet Carter's room had not been tested. *Id.*, bates 112-13; see also Colonel Christopher L. Moore Memorandum, May 31, 2011, ¶ 3.d/**Exhibit K.**

The Commandant's Board reconvened on February 16, 2011. Lt Colonel Lee, Kilo Company tactical officer, testified, as did Captain Justin Pesterfield, the officer-in-charge in Third Battalion on December 12, 2010. Exhibit A, bates 113-14. Cadet Stephen Townes, Kilo Company Commander, testified that on numerous occasions he advised Cadet Carter and other Kilo Company freshmen of the dangers and potential punishments associated with use or possession of synthetic marijuana. *Id.*, bates 114-15. Cadet Lucas Wren then testified to the events of December 12, 2010. *Id.*, bates 115-16. Cadet Carter was afforded the opportunity to question all of these witnesses, as well as those who testified on January 25, 2010. Exhibit E.

Cadet Carter also called several witnesses who testified to Carter's good character. *Id.*; *see also* Exhibit A, bates 117-18. Finally, Cadet Carter testified at length, during which he admitted "he did take two 'hits' off … the smoking device" in the barracks, "and blew it out the window." *Id.*, bates 118-20. He specifically admitted "that he had smoked K2." *Id.* Lastly, the results of the report on the specimen and pipe found in Cadet Carter's room conducted by AccuDiagnostics on February 7, 2010, were entered into evidence. Id., bates 154-55. The specimen tested positive for the synthetic

cannabinoid JWH-018.  *Id*.

The Commandant's Board found "sufficient evidence" that Cadet Carter committed the disciplinary violation of "Possession / Use of a Prohibited Drug – K2 / Spice: synthetic THC.  *Id*., bates 121.  The Board recommended, inter alia, that Carter receive sixty (60) demerits and one-hundred twenty (120) tours.  *Id.*  After reviewing the Commandant's Board Report, Colonel Moore and Colonel Mercado in the Commandant's Office both recommended to President Rosa that Cadet Carter be dismissed for two semesters. Exhibits C, D.; *see also*, Exhibit A, bates 122.  At the time Carter committed this disciplinary offense, the proper authority in this instance to submit an appeal was The Citadel's President, Lt. General John W. Rosa "in the form of a Request for Reconsideration."  Exhibit B, Section VI, ¶ 5.a.(3).

Cadet Carter properly and timely submitted a Request for Reconsideration on April 21, 2011[4], **attached as Exhibit F**, as well as a Supplemental Request for Reconsideration on or about June 20, 2011,[5] **attached as Exhibit G**.  Before President Rosa considered Carter's appeal, though, the Board of Visitors amended the *College Regulations* to make itself the appellate authority for punishments involving suspension, dismissal or expulsion.   **Exhibit I**.  As a result, the Customs and Regulations Committee of the Board of Visitors eventually

---

[4] Cadet Carter provided "two justifications for this request," i.e., "substantial procedural errors in conduction of the Commandant's Board" and further, that the "[d]ecision [of the Board] was arbitrary and not based [sic] evidence and testimony presented."

[5] Carter's Supplemental Request contained a two page, undated letter he authored received by the Commandant's Department on June 20, 2011, Exhibit G, bates 228-29, as well as a three page letter from his mother, Teri Carter.  Both of these documents implored The Citadel to overturn the dismissal and allow him to remain in school unabated but offered no substantive basis for altering the President's decision.  *Id*., bates 230-32.

heard Cadet Carter's appeal on August 16, 2011, and rejected it.[6] **Exhibit J.**

### PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction in federal court, the moving party must clearly demonstrate "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 374-76 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right," *id.* at 376, and should be "granted in limited circumstances and then only sparingly." *See, In re Microsoft Corp. Antitrust Lit.*, 333 F.3d 517, 524 (4th Cir. 2003); *see also, Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F2d. 802, 811 (4th Cir. 1991) ("[f]ederal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far reaching power, which is to be applied 'only in [the] very limited circumstances which clearly demand it.'") (internal citations omitted); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 416 (E.D.N.C. 2006) (explaining the necessity of denying such relief in all but the most extreme of circumstances).

In his brief, Plaintiff suggests the "balance-of-hardship" test set forth in *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d at 195 (4th Cir. 1977) may be the standard on which this Court should weigh the merits of his

---

[6] Pursuant to the *College Regulations,* Carter is eligible for readmission, pending a successful application, in May, 2012. *See* Exhibit B, Section VII, par. 5.b. (A student who has been dismissed… may make written application during the second semester following the semester of discharge for readmission at the beginning of the semester following the application; i.e., a minimum of two semesters must elapse after the semester of dismissal before the semester of readmission) (Attached hereto as Exhibit 1).

injunction request.  Undoubtedly, however, the *Blackwelder* formulation for preliminary injunctions is no longer good law in this Circuit.   In *Real Truth About Obama, Inc. v. Federal Election Com'n*, 575 F.3d 342, 347 (4th Cir. 2009), the Fourth Circuit held that the *Winter* preliminary injunction standard is "far stricter" than the "balance-of-hardship test" test invoked previously in *Blackwelder* and its progeny, which clearly subordinated "likelihood of success on the merits"[7] as a factor.

Winter unmistakably put an end to that notion by not only employing a "far stricter" requirement necessitating that the party seeking injunctive relief "make a clear showing that it will likely succeed on the merits at trial," *see Truth About Obama*, 575 F.3d at 346 (*citing* 129 S.Ct. at 374, 376), but also requiring "that the plaintiff make a clear showing that it is likely to be irreparably harmed absent preliminary relief, *id*., that "'courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction,'" *id. (quoting Winter*, 129 S.Ct. at 376-77), and rejecting outright *Blackwelder's* "allow[ance of Rule 65's four] requirements to be conditionally redefined as other requirements [were] more fully satisfied . . ." *Id*. (citing *Blackwelder*, 550 F.2d at 196).   Accordingly, there should be little doubt that the more lenient *Blackwelder* standard for assessing the merits of Plaintiff's request for an injunction no longer exists.   *Id*. ("[b]ecause of its differences with the *Winter* test, the *Blackwelder* balance-of-hardship test may no longer be applied in granting or denying

---

[7] Under the *Blackwelder* standard, the Fourth Circuit did not truly assess whether the moving party had a "likelihood of success on the merits."  Rather, it employed a more lenient standard.  *See Winter*, 575 F.3d at 346 ([i]n *Blackwelder* we instructed that the likelihood-of-success requirement be considered, <u>if at all,</u> only *after* a balancing of hardships is conducted <u>and then only under the relaxed standard of showing that "grave or serious questions are presented" for litigation.</u>") (emphasis in original) (underlined emphasis added).

preliminary injunctions in the Fourth Circuit, as the standard articulated in *Winter* governs the issuance of preliminary injunctions not only in the Fourth Circuit but in all federal courts.").

**I.     PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE PLAINTIFF CANNOT SATISFY NECESSARY ELEMENTS FOR SUCH RELIEF**

Under the Fourteenth Amendment, no state "shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.   Due process generally requires a two-part analysis: "whether [the claimant] was deprived of a protected interest, and, if so, what process was his due." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428 (1982).  The Supreme Court has assumed without deciding that students have a protected property right in continued enrollment. *See Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 222-23 (1985) (assuming the existence of a protected property interest in student's continued enrollment); *see also Tigrett v. Rector & Visitors of the Univ. of Va.,* 290 F.3d 620, 627 (4th Cir.2002).  Thus, if an institution of higher learning commences disciplinary action against a student, notice and an opportunity to be heard must be given to the student. *Goss v. Lopez,* 419 U.S. 565, 579 (1975).

Here, all of Plaintiff's claims arise out of alleged irregularities in the collection of evidence and deficiencies in the resulting disciplinary proceedings against him which resulted in his dismissal from The Citadel.  So grave were the alleged deficiencies in the process that Plaintiff claims his fundamental rights to due process both under the United States and South Carolina Constitutions were violated.   Each of the Plaintiff's

four separate causes of action[8] is premised on proof of the allegations set forth in Count I of the Complaint; namely, that the Defendants (1) "denied Mr. Carter Due Process by failing to provide meaningful notice and opportunity to be heard on the disciplinary charges brought against Mr. Carter, *see* Complaint ¶ 32, (2) that "Defendants denied Mr. Carter Due Process by failing to provide for adequate protection of a chain-of-custody as to the evidence used against him, *id*. at 33; (3) that Defendants denied Mr. Carter Due Process by imposing an arbitrary punishment, inconsistent with the evidence, facts, and circumstances, *id*. at 34; and (4) that "Defendants denied Mr. Carter Due Process by not providing meaningful application of the aforementioned framework, and in fact, used aforementioned framework as merely a pretext of Due Process. *Id*. at 35.

As an initial matter, Plaintiff bears the "strict" burden of making a "clear showing" that it will succeed on the merits of his case against these Defendants. However, as explained below, Plaintiff has clearly failed to make such a showing. Each of the Plaintiff's contentions is not supported by the clear and undisputed facts, and none rise to the level of a constitutional violation either under the Constitution of United States or the state of South Carolina.[9] Further, Plaintiff has equally failed to demonstrate that injunctive relief is warranted because he is unable to show through competent evidence that he will suffer irreparable harm if he is forced to sit out for the 2011-12 academic

---

[8] Plaintiff's enumerated causes of actions are for (1) Violation of the Fourteenth Amendment's Right to Procedural and Substantive Due Process; (2) Defendant Rosa's Supervisory Liability Pursuant to 42 U.S.C. § 1983, (3) Violation of Article 1, Section 3 of the South Carolina Constitution, and (4) Request for Injunctive Relief.

[9] This claim mirrors Plaintiff's Due Process cause of action under the Fourteenth Amendment.

year, that the balance of equities tip in his favor or that the public interest will be served by the granting of an injunction.

**A. Plaintiff Cannot Clearly Show That He Will Likely Succeed On The Merits**

    **1. <u>There Is No Evidence Demonstrating Defendants Failed to Provide Meaningful Notice and Opportunity to Be Heard in Violation of Plaintiff's Right to Due Process</u>**

The "essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (*quoting Joint Anti-Fascist Commission v. McGrath, 3*41 U.S. 123, 171-72, (1951)).   In the academic setting particularly, the Supreme Court has recognized that the requirements of due process may be satisfied by something less than a trial-like proceeding.   *See Goss*, 419 U.S. at 575.   Although disciplinary proceedings require more stringent procedural protection than academic evaluations, "labeling a school proceeding disciplinary in nature, however, does not mean that complete adherence to the judicial model of decisionmaking is required." *Henson v. Honor Comm. Of Univ. of Va.,* 719 F.2d 69 (4th Cir. 1983).   Indeed, there are numerous instances in which courts have permitted variations on the "trial model" in differing settings even though individual interests of significant importance were at risk. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539 (1974);  *see also Ingraham v. Wright*, 430 U.S. 651,  (1977);  *Wimmer v. Lehman*, 705 F.2d 1402 (4th Cir.1983).

This Court has previously addressed alleged constitutional violations in connection with The Citadel's disciplinary system in *Just v. The Citadel*, C/A 2:96-1251-18 (**attached as Exhibit H**).   Therein, this Court noted that "[i]n general due process in the

context of a student disciplinary proceedings requires notice and an opportunity to be heard before the expulsion or significant suspension of a student." *Just*, pp.9-10 (*citing Henson*, 719 F.2d at 73.)  This Court further explained that:

> In student disciplinary proceedings, the notice and opportunity to be heard should provide the following safeguards in order to satisfy the requirements of due process: (1) the student must be notified before the hearing of the charges against him; (2) he is entitled to the names of the witnesses against him and either a summary of their testimony or the opportunity to confront and cross-examine these witnesses; (3) he has the right to be heard in his own defense and to be present and present evidence on his own behalf; and (4) serious disciplinary action should be based upon ample evidence such that the decision is not arbitrary or capricious.

*Just*, pp.11-12 (*citing Bistrick v. University of S.C.,* 324 F.Supp. 942 (D.S.C. 1971)); *Herman v. University of S.C.,* 341 F.Supp. 226 (D.S.C. 1971)).

Based on Plaintiff's Complaint and Memorandum in Support of Preliminary Injunction, it is not entirely clear on what basis Carter claims he was not provided with meaningful notice and opportunity to be heard as part of the disciplinary proceedings which resulted in his dismissal.  In ¶ 16 of the Complaint, Carter alleged generally that he was "never granted a hearing so that he could call and examine witnesses," that "he has not been afforded the opportunity to confront and cross-examine witnesses that have been called against him, *id*., and that he was not "afforded the opportunity to be represented by legal counsel to assist and guide him through the process as required by fundamental procedural due process."  *Id*.   However, these general allegations are contradicted in large part by subsequent assertions in the Complaint wherein it is alleged that a Commandants Board was "organized and convened" to address the charges, Complaint, ¶ 26, that evidence, or the alleged "lack of evidence [was]

presented against Mr. Carter, *id.* at 27, that a second Commandants Board was reconvened "three weeks" after the first Board was dismissed, *id.* at 28, that the second Commandants Board "found enough evidence to convict and punish internally." *Id* at 29. Thus, by Carter's own Complaint, there is no merit to the assertion that no hearing was held so that he could call witnesses on his behalf and cross-examine witnesses testifying against him.

Furthermore, the evidence as supported by Defendants' Affidavits and various documents attached to this Memorandum clearly contradict these assertions by Carter.

### a. Cadet Carter was provided with notice of case against him

As set forth in detail in the Statement of Facts section above, Cadet Carter was given notice of the allegations against him in the form of a Performance Report ("PR"), which specified the "Date of Offense" and identified the "Violation of Regulations" as "Possession/Use of a Prohibited Drug—K2/ Spice: synthetic THC." The PR additionally set forth the punishment for the alleged offense as "Maximum Punishment: Dismissal." On January 13, 2011, following notice of the PR, Major Remsen provided Cadet Carter with a detailed briefing of the charges against him and his rights regarding the upcoming Commandant Board, which was memorialized in a "Rights Briefing"[10] document." Exhibit A, bates 142. Both Major Remsen and Cadet Carter signed this document. *Id*. Consistent with the PR, the Rights Briefing described the alleged disciplinary offense and the maximum punishment; in addition, Cadet Carter acknowledged the receipt of certain document regarding the charges against him and various rights he had regarding

---

[10] The Rights Briefing serves as an acknowledgement that the accused Cadet has been "informed . . . of [his] rights under the regulations of the South Carolina Corps of Cadets . . ." *See* Exhibit A, bates 142.

the conduct of the hearing, such as the right to be advised by a cadet or faculty or staff member, the right to not testify, the right to present witnesses, and the right to cross-examine witnesses called to testify against him. *Id*. On January 13, 2011, notice was provided to Cadet Carter that the Commandant's Board #17 would be convened at 4:00 p.m. on January 25, 2011. After commencing indeed on January 25, the Board was postponed when it was discovered that the evidence of Cadet Carter's use of K2/Spice had not been sent to a lab for testing. The evidence was subsequently sent to a lab for testing. After receiving the results of the test back, Commandant's Board #17 was reconvened on February 16, 2009. Cadet Carter was provided notice of the reconvened Board on February 9, 2011.

This evidence overwhelmingly demonstrates that Carter was provided with notice of the charges against him. At every step of the process, Carter was timely informed that his conduct violated The Citadel's policy of possessing and using a prohibited drug and that he faced dismissal if found to be in violation of the policy. At no time did the disciplinary proceedings against Carter proceed without him being provided a detailed description of his alleged offense and possible punishment. Carter's Complaint alleging that his procedural due process rights were violated based on lack of notice of the case against him is manifestly without merit, and thus, provides no support for his request for injunctive relief.

    b.  <u>Cadet Carter had meaningful opportunity to respond and contest charges against him</u>

Any contention by Cadet Carter that he no meaningful opportunity to be heard in his defense should be summarily rejected by this Court. At both the Board hearings

held on January 25 and February 16, 2011, Cadet Carter was present along with his self-selected adviser, Raymond Anderson, a senior in the Corp of Cadets holding the rank of Captain.  Carter had the choice of selecting a fellow cadet, faculty or staff member as his advisor.  As set forth above, Carter was provided with a list of all the witnesses who would offer testimony against him.  Carter cross-examined each of these witnesses.  In the presentation of his own case, Carter had the right to and called several witnesses; he also made a closing statement to the members of the Board.   Not only did Carter have a meaningful opportunity to be heard and respond to the charges at the Commandant's Board held on January 25 and reconvened of February 16, Carter also had a full and fair opportunity to present his dismissal on appeal. *See Exhibit B,* Section VI, ¶ 3.a. ("Students accused of a violation of disciplinary regulations which may lead to suspension, dismissal, or expulsion are entitled . . . "to be able to submit a petition of appeal to the proper authority should the decision go against them."). [11]   Cadet Carter submitted multiple Requests for Reconsideration, as well as correspondence from legal counsel, all of which were taken into account by the Customs and Regulations

---

[11] The College Regulations set forth three bases for an appeal.  Importantly, it is expressly stated that the appellate process is not a forum to relitigate the facts of the case.  Exhibit  B.  Section 5.b. provides:

**Grounds**:  An appeal does not provide a second forum in which to present the case.  Appeals deal only with how a decision has been reached and not with the decision itself. . .  The following are the exclusive grounds for all disciplinary and academic appeals:

(1)      that the hearing officer or board failed to follow approved written procedures;
(2)      that the decision is arbitrary, that is unreasonable and not based upon or consistent with the evidence and testimony presented;
(3)      that significant evidence has been discovered since the hearing that was not available at the time the decision was reached.

At no point in the Request for Reconsideration process did Cadet Carter present any new evidence to support his appeal.

Committee of the Board of Visitors before it denied his Requests on August 16, 2011. *See* Exhibit J.

These facts clearly demonstrate that Cadet Carter had a meaningful opportunity to be heard during the entire disciplinary process leading up to his dismissal. At every stage, Carter presented facts and arguments supporting his belief that dismissal was unwarranted and that a lesser punishment should be applied. Due process does not require an ultimate ruling in his favor; it only mandates that he be provided with notice of the charges and an opportunity to respond to them. There should be no doubt whatsoever that Cadet Carter had such an opportunity and that he exercised it to the fully extent possible.

    **2.   Defendants' Handling and Testing of Evidence of K2/Spice Did Not Violate Cadet Carter's Right to Due Process**

Carter next contends that his due process rights were violated because Defendants failed to "provide for adequate protection of a chain-of-custody as to the evidence used against him." As an initial matter, Carter's Complaint contains no cause of action that his rights were violated under the Fourth Amendment, which protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Although "searches by public school officials . . . [can] implicate Fourth Amendment interests, *Board Of Ed. Of Independent School Dist. No. 92 Of Pottawatomie Cty. V. Earls*, 536 U.S. 822 (2002), *reversed*, 242

F.3d 1264, no such claim is being made here. Thus, Carter's due process claim in this respect must be evaluated solely in a Fourteenth Amendment context.[12]

In several paragraphs of the Complaint, Carter either impliedly or expressly contends that the specimen and pipe collected by Carter's cadet superiors were somehow contaminated through negligence or perhaps intentional wrongdoing. *See* Complaint, ¶ 21 ("the pipe disappeared . . . not less than two hours"); *id*. at ¶ 22 ("the pipe resurfaces in a senior room"); *id*. at 24 ("when the pipe was finally tested, after hours of contamination, no documentation and inadequate supervision"). The contention that the Citadel's handling of the evidence which tested as K2/Spice violated due process norms is indeed curious in that Cadet Carter readily, and repeatedly, admitted that he, in fact, knowingly smoked K2/Spice on December 11, 2010, along with two of his classmates. Exhibit A, bates 135 ("My classmate got caught with a bowl in

---

[12] Even if Carter had alleged in his Complaint that his Fourth Amendment rights were violated, such a claim would fail. First, no search arguably ever took place; rather, the K2/Spice and pipe/bowl were discovered during a routine inspection of Cadet Carter's room. The Citadel is a military college which subjects its students to frequent inspections. Chapter 5, ¶ H of the *Blue Book*, under the heading "COMMAND INSPECTIONS" expressly provides that "Cadets are subject to daily personal inspections and barracks inspections at any time by their Chain of command, designated representatives of the Commandant's Office, and Officers of the Guard." The routine nature of on-campus inspections is both well-known and accepted as a natural aspect of attendance at The Citadel. Moreover, to the extent the discovery of K2/Spice could be deemed a search, Cadet Carter had no reasonable expectation of privacy. *Cf*., *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 657 (1995) (where Court upheld a school district's policy of subjecting student athletes to random, suspicionless drug tests on ground that "students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy."). Second, Cadet Carter has no standing to complain of the alleged search which led to the discovery of K2/Spice. The K2/Spice and pipe-bowl were found in the "half-press" of his roommate, Cadet Alexander Nelson. Since the Supreme Court's decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it has been the law that the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). Here, Cadet Carter had no legitimate expectation of privacy in the "half-press" of Cadet Nelson. Accordingly, the fruits of the alleged "search" which discovered the K2/Spice can not be objected to by Carter.

my room that we all smoked out of. . . I thought that K2, or spice, was not illegal but it was looked down on like coming back to the barracks drunk. . .").   During the reconvened Commandants' Board on February 16, 2011, Carter again admitted that he smoked K2/Spice on December 11, 2010, while on campus at The Citadel, describing it has taking two "hits" and then blowing it out the window.  *Id*., bates 118-20.  Cadet Carter also admitted smoking K2/Spice in a letter he wrote to President Rosa over the Christmas holidays, a copy of which was presented at the Commandant's Board.  *Id., bates* 156  ("One of my classmates that I thought was a friend offered spice, or k2, to me and I accepted his offer.  On December 12, he was caught with the k2 and a bowl.  We did indeed smoke it in the barracks and I know it was wrong.").

Furthermore, Carter can not make out a successful due process claim by claiming that The Citadel's Commandant's Board did not require the collection of the K2/Spice specimen and pipe to adhere to the chain-of-custody, evidence-collection procedures required by criminal courts.  It has long been recognized that due process does not mandate a school's disciplinary process adhere to a judicial model:

> In some respects, [school] procedures concededly fall short of the stringent protections afforded the criminal defendant; that is not, however, a defect of constitutional dimension. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Board of Curators v. Horowitz,* 435 U.S. 78, 102, 98 S.Ct. 948, 961, 55 L.Ed.2d 124 (1978) (quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). The Supreme Court has made it plain that "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances. The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47

L.Ed.2d 18 (1976) (quoting *Joint Anti-Fascist Commission v. McGrath,* 341
U.S. 123, 171-72, 71 S.Ct. 624, 648-49, 95 L.Ed. 817 (1951)).

*Henson v Honor Committee of U. Va*., 719 F.2d at 73-74.   Where, as here, the
proceedings took place in an academic setting, "the requirements of due process may
be satisfied by something less than a trial-like proceeding."   *Id. (citing Goss v. Lopez,
supra*.

Chain of custody is an evidentiary concept.[13]   To the extent Carter claims the
collection of evidence violated some unspecified and undefined chain-of-custody
requirement, it did not violate Carter's due process rights.   The Board obviously was
satisfied that the K2/Spice and pipe used by Cadet Carter were both collected and
tested properly.   Moreover, Carter failed to raise chain-of-custody at the Board hearings
on January 25 and February 16, during his initial Request for Consideration or
Supplemental Request for Reconsideration so that the issue could have been adequately
inquired into.   The reason Carter failed to object on chain-of-custody grounds are quite
obvious.   First, there is no evidence whatsoever that the K2/Spice specimen and pipe
were contaminated.   Second, raising such an objection so would have been pointless
and completely contradictory to Carter's immediate and subsequent admissions to his
cadet chain of command, the members of the Commandant's Board and to President
Rosa that he smoked the K2/Spice on December 11, 2010.

---

[13] See Black Law Dictionary (5th ed. 1979) ("*In evidence*, the one who offers real evidence . . . must account
for the custody of the evidence . . .").

There is no dispute that what Cadet Carter thought he was smoking—K2/Spice—turned out to be indeed K2/Spice.   Carter's argument that his due process rights were violated because of alleged chain-of-custody issues is completely without merit.

**3.  Punishment of Dismissal Was Not Arbitrary and Did Not Violate Due Process**

As noted above, the precise basis upon which Carter's claims is premised is difficult to determine.   Having now already addressed the substance Carter's initial accusations of constitutional violations (i.e., failure to provide notice and opportunity to be heard and improper chain-of-custody), these Defendants now turn to Carter's remaining allegations:  that he was denied due process by virtue of the imposition of "an arbitrary punishment, inconsistent with the evidence, facts, and circumstances, *see* Complaint, ¶ 34, and that Defendants denied him due process by not "providing meaningful application of the aforementioned framework, and in fact, used aforementioned framework as merely a pretext of Due Process."   *Id*. at 35.   Although expressed differently, paragraphs 34 and 35 essentially claim the same thing, which is that The Citadel's entire disciplinary process was fatally flawed and that Cadet Carter was punished arbitrarily as a result despite the fact that there was an inadequate factual basis to support same.

The facts upon which Carter apparently base this assertion are taken from various paragraphs of the Complaint; namely, (1) that the initial meeting of the Commandant's Board on January 25, 2011 "was dismissed for lack of evidence[, which a]t that point in time, the case against Mr. Carter should have been dismissed, *id*. at ¶ 11; (2) that the Board was reconvened on February 16, 2011 after a "meaningless and

prolonged delay in violation of The Citadel's own rules, which delay significantly and permanently prejudiced Mr. Carter, *id*. at ¶ 13, (3) that the Commandant's Board recommended "in house" punishment "based on the facts and the evidence [but] was arbitrarily overruled by the individual Defendants, who all unanimously recommended dismissal. *Id*. at ¶ 13-14. There are, however, simply no facts which support these allegations. The initial Commandant's Board was never dismissed for lack of evidence; Cadet Carter suffered no prejudice because the initial Board hearing was convened, postponed and reconvened a few weeks later, and the President's decision to reject the recommendation of the Board and impose a punishment of dismissal was not arbitrary.

        a.    <u>January 25, 2011 Commandant's Board was not dismissed for lack of evidence</u>

After being notified of the charges against him and that he could face dismissal if those charges were proven, a Commandant's Board was held on January 25, 2011. Having been fully briefed of all of his rights under the applicable regulations, Exhibit A, bates 142, Cadet Carter attended along with his adviser, Cadet Anderson. Lt. Col Sberna was the first witness and testified at length about the education program provided to freshmen during the Fall of 2010 concerning the dangers, including the punishments associated therewith, of K2 and other synthetic marijuana substances. Exhibit A, bates 110-11. Cadet Frontz also testified and described his discovery of the drug paraphernalia in Cadet Carter's room. *Id*., bates 111-12. It was at this point that the Board President called for a recess. *Id*., bates 112 Following the recess, the Board President announced that "the Board was being postponed in the cadet's best interest so that he [would have] the benefit of all the evidence." *Id*. Specifically, it was

discovered at that time that specimen and pipe had not been sent to a lab for testing to confirm its identity.  Exhibit K, ¶ 3.  The Board President specifically announced that the Board was being continued "to a later date."  Exhibit A, bates 113.

No objection to the postponement or reconvening of the Board was made by Cadet Carter at the Board hearing.  Neither in his brief or Complaint does Carter cite any legal precedent or provision from The Citadel's Blue Book or College Regulations which support his contention that the charges against him should have been dismissed at that time.  Certainly, the Fourteenth's due process clause does not require such a result.  Indeed, as Colonel Moore set forth in his Memorandum on this issue, the results of testing the specimen and pipe could have only benefited Carter on the chance that it could have come back negative.  Exhibit K, ¶ 3.d.  The fact that the test subsequently came back positive was "merely cumulative to Cadet Carter's admission that he ha[d] smoked K2."  *Id*.

  b.  <u>Reconvening of Board on February 16, 2011 was not prolonged, did not violate The Citadel's own rules prejudice Cadet Carter</u>

Nineteen days after the initial Board was postponed, the Commandant's Board reconvened on February 16 for the continued presentation of evidence against Cadet Carter.  Nowhere in Carter's brief or Complaint does he explain why the nineteen days which passed was "prolonged," why it resulted in prejudice to Cadet Carter or what particular Citadel rule or regulation the postponement violated.  Carter makes no assertion that witnesses or documents were not available to him on February 16 because of the postponement which would have been helpful to his case.  Neither can it be suggested that Carter was prejudiced by the results of the testing on the specimen,

which merely corroborated Carter's repeated admissions that he had, in fact, smoked K2/Spice.   Due process requires only that Cadet Carter be notified of the charges and the opportunity to be heard.   The postponement of the Board for nineteen days did not interfere with these requirements because there was no change in the charges, maximum punishment or identity of witnesses scheduled to testify against Cadet Carter.

      c.   <u>President Rosa's decision to reject Commandant's Board's recommendation and impose punishment of dismissal was not arbitrary</u>

After hearing all of the evidence, the Commandant's Board found sufficient evidence that Cadet Carter "committed the violation: Possession/Use of a Prohibited Drug."   The Board recommended that Carter receive "60 Demerits and 120 Tours."   However, upon recommendation of Col. Moore and Col. Mercado, President Rosa imposed the punishment of dismissal.   Exhibit A, bates 122.  Cadet Carter subsequently filed a Request for Reconsideration and a Supplemental Request for Reconsideration.   Both Requests were denied.

Contrary to Plaintiff's allegations, President Rosa's decision to reject the recommendation of the Board was not arbitrary.  The *College Regulations* provide that "Investigations of violations of disciplinary regulations will be made by officers on boards, appointed by the President . . . as appropriate."  Exhibit B, Section VI, ¶ 1.a.  The Regulations further provide that "(b)ased on the evidence presented, the hearing officer or board may *recommend* any appropriate penalty to the appointing authority."  *Id.,* ¶ 3.d (emphasis added).   Importantly, "penalties involving suspension, dismissal, or

expulsion may be *recommended* to the President by the appointing authority and shall be imposed *only by the President*." *Id.,* (emphasis added).

The Board's express authority was simply to recommend an "appropriate penalty" to the President, which it did. President Rosa chose to administer a penalty which could "only be imposed by the President." The *College Regulations* clearly set forth that "any student knowingly and willingly possessing or using [these particular drugs" "at any time or place, whether on- or off- campus . . . [would be] subject to dismissal from the College." *Id.*, Section IV, ¶ 19.a(1). Thus, there was nothing arbitrary in President Rosa's decision to reject the Commandant's Board recommendation and impose a punishment that was expressly contemplated by the applicable regulations.

In *Tigrett v. Rector and Visitors of University of Virginia*, 290 F.3d 620 (4th Cir. 2002), the Fourth Circuit upheld the University of Virginia's expulsion of several students for disciplinary violations. In so doing, the Court rejected Appellants' contention that their due process rights were violated when President Casteen, who had been appointed the "final decision maker," imposed upon them more severe sanctions than those recommended by the Panel, which heard the evidence. Similar to the President's decision in *Tigrett*, President Rosa's decision to dismiss Cadet Carter constitutes a more severe punishment than recommended by the Board; however, such a decision, which he was empowered to do, does not implicate the due process clause of the Fourteenth Amendment. *Id*.

**4. Defendants' Actions Did Not Violate Cadet Carter's Substantive Due Process Rights**

Injunctive relief should likewise be denied because there is no likelihood that Cadet Carter could ever prove that that his substantive due process rights were violated by the Defendants.

To demonstrate a violation of substantive due process requires that "a student must demonstrate arbitrary and capricious conduct on the part of university officials by showing that there was no rational basis for the university's decision or must show that the decision was motivated by bad faith or ill will unrelated to academic performance." *Vega v. Saleeby*, 2004 WL 3334816 (D.S.C.) (*quoting Cobb v. Rector & Visitors of the Univ. of Va.,* 69 F.Supp.2d 815, 826 (W.D.Va.1999). A plaintiff must demonstrate some "egregious official conduct" which constitutes "an abuse of power that shocks the conscience." *Dunn v. Fairfield Community High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir.1998). Clearly, Cadet Carter has failed to do so.

Defendants' actions in the conduct of the Commandant's Board and the review of Carter's Requests for Reconsideration were clearly not arbitrary or capricious; instead, the disciplinary proceedings and appellate review of same were all rationally based on the facts and circumstances presented to the Board and on appeal, as well as the College Regulations which specifically set forth that the knowing use of K2/Spice as a drug was prohibited and could result in dismissal.

**5. President Rosa Has No Supervisory Liability Because Cadet Carter Has Failed to Show That He Suffered A Constitutional Injury**

In *Baynard v. Malone,* 268 F.3d 228 (4th Cir.2001), the Fourth Circuit held that "[i]t is well settled that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Id.* at 235 (citations omitted). To prove a supervisory liability claim under § 1983, Cadet Carter must demonstrate "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like them; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by them. *Tigrett*, 290 F.3d at 630.

For the reasons set forth above, Cadet Carter has failed to show that his due process rights were violated by Defendants. Accordingly, his supervisory liability claim under § 1983 against President Rosa must similarly fail, and thus, can not form the basis for injunctive relief. *Id*. at 630-31 ("Because the Appellants have failed to demonstrate a constitutional injury in connection with the UJC Trial, their supervisory liability claim fails on the third prong of the . . . test, i.e., there is no affirmative causal link between the supervisor's inaction and any constitutional injury suffered by the Appellants.").

### B. Plaintiff Cannot Clearly Show That He Will Suffer Irreparable Harm If Injunctive Relief Is Denied

Plaintiff next argues that he will suffer irreparable harm because his education will be delayed if he is forced to sit out two semesters. While The Citadel does not deny that the Plaintiff will, at a minimum, suffer some harm from his dismissal through embarrassment, such harm is not irreparable. In *Jones v. Board of Governors of University of North Carolina*, 704 F.2d 713, 715 (4th Cir.1983), the Fourth Circuit concluded that a nursing student who had been expelled for academic dishonesty would "obviously suffer irreparable injury" since "she would have a gap in her education which she will be forced to explain throughout her professional life; and she will be deprived of the opportunity to complete her education with her fellow classmates." *Jones*, at 716. At best, however, the Court's pronouncement concerning Jones' harm is dictum; neither the District Court nor the Fourth Circuit cited any authority for the proposition that a college student automatically suffers irreparable harm when his or her education is delayed, and other courts, both before and since, have specifically declined to reach such a conclusion. *See Sill v. Pennsylvania State Univ.*, 315 F.Supp. 125 (M.D. Pa. 1970) ("I decline to hold, as suggested by plaintiffs, that the mere interruption of a student's education constitutes irreparable injury."); *Ben-Yonatan v. Concordia College Corp.*, 863 F.Supp. 983 (D.Minn. 1994); *Stockstill v. Quinnipiac University*, 2010 WL 2011152, *5 (D.Conn. May 19, 2010); *Law v. William Marsh Rice University*, 123 S.W.3d 786, 794, 184 Ed. Law Rep. 641, 641 (Tex.App.-Hous. (14 Dist.) Dec 11, 2003). Indeed, no Court since Jones has ever cited it for the proposition that delay in a college education is irreparable harm. In fact, since *Jones* and until *Winter*, the Fourth Circuit has repeatedly ruled that

where the harm suffered by the moving party may be compensated by an award of money damages at judgment, alleged harm is not irreparable. *Hughes Network Systems, Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994); *A Helping Hand, LLC v Baltimore County, MD*, 355 Fed Appx. 773 (4th Cir. 2009).

In truth, the Court's decision in *Jones* was merely a *Blackwelder* balancing analysis. Even before it perfunctorily noted that Jones "will obviously suffer irreparable injury," the Court "start(ed) by noting that the balance of hardships presented here weighs heavily in favor of plaintiff Jones." The Court then found "little force in the University's assertions that its disciplinary code or academic standing and integrity will be harmed to any significant degree by a court order requiring Jones's reinstatement pending resolution of her lawsuit." As a result, the Court found there would be "far more substantial, concrete injury if the injunction is dissolved and she is ultimately vindicated than (would) the University if the injunction stands and its position is finally upheld." Indeed, in its most telling reliance on *Blackwelder*, the Court then noted "Given this balance of hardships, the district court's issuance of a preliminary injunction preserving the *status quo ante* was entirely proper if Jones has presented 'grave or serious questions' of procedural due process violations."

Here, by contrast, this Court may no longer "balance … hardships," and even if it does, Carter has not presented "grave or serious questions." As a result, this Court should deny Plaintiff's motion.

C. **The Balance Of Equities Tips In Favor Of The Citadel And The Public Interest Favors Denying Preliminary Injunction**.

This Court should also deny Plaintiff's motion for a preliminary injunction because the balance of equities tips in favor of The Citadel and because such an injunction is not in the public interest. Indeed, the public interest favors denying such an injunction. As noted by Col. Mercado and Col. Moore, in June of 2010, the administration of The Citadel specifically requested the Board of Visitors to increase the punishment for use of synthetic marijuana and other legal hallucinogens because of the dangers presented by these substances. Exhibit C, ¶ 7-8; Exhibit D, ¶ 10. Since the Board of Visitors took that action, the Drug Enforcement Agency has added five synthetic cannabinoids to Schedule 1 of the Controlled Substances Act, including the substance involved in this case. 76 FR 11075. In its action, the DEA noted the following:

> The temporary placement of these five synthetic cannabinoids into Schedule I of the CSA is necessary in order to avoid an imminent hazard to the public safety. First, these substances are not intended for human consumption, but there has been a rapid and significant increase in abuse of these substances in the United States. As a result of this abuse, synthetic cannabinoids are banned in at least 18 states in the United States and several countries, and all five branches of the U.S. military prohibit military personnel from possessing or using synthetic cannabinoids. Second, law enforcement has seized synthetic cannabinoids in conjunction with controlled substances and based on self reports to law enforcement and health care professionals, synthetic cannabinoids are abused for their psychoactive properties. Third, numerous state and local public health departments and poison control centers have issued health warnings describing the adverse health effects associated with synthetic cannabinoids. Based on scientific data currently available, these five substances have the potential to be extremely harmful and, therefore, pose an imminent hazard to the public safety

Id. Since the DEA took its action, in turn, the Board of Visitors has again increased the punishment for use or possession of any illegal synthetic marijuana: pursuant to the

*College Regulations* adopted in June, 2011, students at The Citadel who use or possess these substances, at any time, are currently subject to expulsion. By contrast, Plaintiff offers no evidence that the public has any interest in his temporary return to The Citadel pending the outcome of this litigation. Thus, this Court should not grant Plaintiff's motion on this ground.

II.     **NONE OF THE CURRENT DEFENDANTS CAN GRANT PLAINTIFF THE RELIEF HE HAS REQUESTED.**

As a practical matter, Plaintiff has failed to join several necessary parties to this litigation. As noted above, pursuant to the *College Regulations,* only the President of The Citadel can dismiss a cadet, and only the Board of Visitors can reverse such a decision. Exhibit B, Section VII, par. 1. Although Plaintiff has attempted to sue "The Citadel" and the Board of Visitors collectively, both of those entities are alter egos of the State of South Carolina, and thus, immune from suit in the Federal Courts pursuant to the 11th Amendment. As a result, both of those defendants must be dismissed. While Plaintiff has named President as a defendant, as well as Col. Mercado and Col. Moore, none of those officials have authority to reverse a decision of the Board of Visitors. Thus, to the extent Plaintiff seeks readmission to The Citadel or relief from its disciplinary system, this Court does not currently have jurisdiction over the individuals vested with the authority to grant that relief. As a result, this Court can, and should, deny his motion on that ground alone.

**CONCLUSION**

For all of the foregoing reasons, this Court should deny the Plaintiff's motion for

a preliminary injunction.

BARNWELL WHALEY PATTERSON & HELMS, LLC

By:      s/Craig E. Burgess
          M. Dawes Cooke, Jr., Fed. I.D. No. 288
          Craig E. Burgess, Fed. I.D. No. 5894
          885 Island Park Drive (29492)
          P O Drawer H
          Charleston, SC 29402
          843-577-7700 FAX 843-577-7708
          mdc@barnwell-whaley.com
          cburgess@barnwell-whaley.com

          *ATTORNEYS FOR DEFENDANTS*

August 30, 2011

Charleston, South Carolina